## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| VERSUS | |
| JOSE ANTONIO RODRIGUEZ LARA | NO.: 14-00124-JWD-SCR |

## RULING AND ORDER

Before the Court is Jose Antonio Rodriguez Lara's ("Defendant") **Motion to Suppress Evidence (Doc. 21),** seeking to suppress "any and all evidence allegedly obtained from Defendant" during a traffic stop on Interstate 12 ("I-12") in Baton Rouge, Louisiana. (*Id.* at p. 1). The United States of America ("Government") filed a memorandum in opposition. (Doc. 25). Defendant filed a reply to the Government's opposition. (Doc. 27). On April 6, 2015, the Court held an evidentiary hearing on the motion, and permitted the filing of post-hearing briefs. (*See* Docs. 38, 39). For the reasons explained below, Defendant's Motion will be **DENIED**.

### I. BACKGROUND

On October 16, 2014, El Expreso, a commercial transportation carrier was traveling eastbound on I-12 in Baton Rouge, Louisiana. The driver, Ivan Morales's (hereinafter "the driver") version of the events on the early morning in question differs from that of the officers. Accordingly, the Court will provide each in turn.

Around the vicinity of mile marker 1 or 2, at approximately 2:15 a.m., Corporal Luke Cowart ("Corporal Cowart") and Corporal Cody David ("Corporal David"), members of the High Intensity Drug Trafficking Area Task Force, allegedly observed the El Expreso passenger

bus swerve and drift in and out of its lane of travel, in violation of state and city law.[1] Specifically, Corporal Cowart testified that he "observed the bus cross over the left then the right white-dashed line, basically swerving, drifting." (Tr. 10:8-9). Corporal David stated that the bus drove "basically, right on top of the line." (Tr. 78:1-3). He then clarified that the bus "crossed within a few inches." (Tr. 78:13-20).[2] Nevertheless, pursuant to the emergency lights and sirens, the bus pulled over to the shoulder of the interstate.

Corporal Cowart testified that he exited his unit and approached the front of the bus to speak with the driver. Upon making contact, he said, "Look, man, you were drifting out your lane. Everything okay tonight?" (Tr. 13:2-3). To which the driver responded, "yes, sir," before confirming that he was not "too sleepy." (Tr. 13:4-6). Corporal Cowart then immediately told the driver "Look, man, I'm just going to give you a warning. I'm not writing you a ticket for that," before inquiring about the driver's itinerary and the number of passengers on board. (Tr. 13:7-10). The driver then allegedly answered that he had come from Houston, Texas, and was traveling to Atlanta, Georgia. (Tr. 13:12-13). Corporal Cowart could not recall how many passengers the driver said were on the bus, but stated that asking that information is one of the routine questions he proposes in these types of encounters. (Tr. 13:15-21). Corporal Cowart then testified that "at that point, [he] asked [the driver] for consent to use [his] narcotics-detecting K9 to search the bags underneath the bus – or sniff the bags underneath the bus." (Tr. 15:12-14). Rukus, Corporal Cowart's narcotics-detecting canine, was riding along with him and

---

[1] The Government contends that the driver's actions violate Baton Rouge, Louisiana, Code of Ordinances, Traffic Code Sections 11:53(b) (Traffic Lanes) and 11:103 (Turning Movements and Required Signals). (Doc. 25-1 at p. 2).

[2] Although neither party raised the issue, the Court notes for the record that the combined testimony from the evidentiary hearing makes clear that despite the driver's native language being Spanish, and the fact that the officers only spoke to him in English, there were no issues communicating throughout the duration of the stop. (*See* Tr. 13:22-14:7; 15:1-9; 74:5-9; 110:8-10). Nevertheless, as Spanish is the driver's native language, he testified via an interpreter at the evidentiary hearing. (Tr. 102:16-18).

Corporal David on the night in question. Corporal Cowart states that the driver granted consent, stating, "Yes, sure. Go ahead."

In contrast, the driver maintains that he did not fail to maintain his lane of travel, and thus, did not commit a traffic violation. (Tr. 104:3-5; 105:1-2). He further states that the officers never informed him of an alleged traffic violation, and instead approached and immediately stated something to the effect of: "We stopped you to check the bus" or "We're going to check the bus." (Tr. 113:3-8; 118:3-6). He further testified that he knew to drive particularly carefully in the area in question because he was aware of the police presence, and their tendency to stop commercial buses. (Tr. 104:12-22). Indeed, the driver himself had just been stopped two days prior, while driving a commercial bus for El Expreso in the same area on I-12 in Baton Rouge. (Tr. 104:23-25; 123:2-12). That stop did not result in any arrests. Nevertheless, the driver cooperated with the police in effectuating the dog sniff search of the luggage compartment because he believed he could not refuse the police's request, and because he believed that the officers were just "doing their job." (Tr. 105:12-22; 117:17-21). He also conveyed his belief that any refusal of consent would be interpreted by the officers as he must be hiding something. (Tr. 117:22-24).

Corporal Cowart estimated that time elapsed between the initial stop until the driver's consent was approximately three to four minutes. (Tr. 16:18-25). At some point while Corporal Cowart was speaking with the driver, two additional officers, Brad Bickham and Rusky Jenkins, arrived on scene. (Tr. 17:12-15). They also approached the driver. Corporal Cowart stated that it was common practice to assist other officers in effectuating these types of stops for "officer safety," given the large number of passengers on the bus. (Tr. 17:16-21).

The driver's version of the events and the officer's version of the events are for the most part consistent for the remainder of the stop. At some point after speaking with the driver, Corporal Cowart returned to his vehicle to retrieve Rukus. Officer Cowart then walked back to the bus and ordered Rukus to conduct a sniff search of the luggage compartment. (Tr. 18:5-8). Moments into the search, Rukus alerted on a cardboard box by scratching, which is indicative of her smelling something she was trained to detect. (Tr. 19:10-18). The officers removed the box and Rukus continued her sniff search. (Tr. 19:19-20:2). She then alerted to a second bag. (Tr. 21:4-21). Neither the box nor the bag had any information identifying the owner of the item on their exteriors.

The officers then boarded the bus with the driver to attempt to ascertain the owner. The driver translated the officer's questions, as he walked up and down the aisle to ensure that all occupants had an opportunity to view the box. Some passengers remained asleep during the announcement. When no one on the bus claimed the bags, the officers searched the cardboard box and the bag pursuant to the alert. The search revealed a photograph, which they matched to Defendant, as well as a large number of candles. Specifically, officers retrieved forty-eight candles encased in glass weighing approximately seventy-two pounds, and four larger candles weighing approximately forty-one pounds. A random sampling of the wax from the candles tested positive for the presence of methamphetamine. Defendant was escorted off of the bus, read his *Miranda* rights, and subsequently arrested.

The question raised by Defendant's motion is whether the traffic stop and subsequent warrantless canine sniff search of the luggage compartment and the officer search of Defendant's own luggage conducted on October 16, 2014, violated Defendant's Fourth Amendment rights.

## II. LAW & ANALYSIS

The principle that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions" is among those most firmly ingrained in our constitutional criminal procedure jurisprudence. *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). Generally, "[t]he proponent of a motion to suppress has the burden of proving, by a preponderance of evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights." *United States v. Kelley*, 981 F.2d 1464, 1467 (5th Cir. 1993) (quoting *United States v. Smith,* 978 F.2d 171, 176 (5th Cir. 1992)). However, in cases where a search is not conducted pursuant to a warrant, the government bears the burden of proving that the search was valid. *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citing *United States v. Castro*, 166 F.3d 728, 733 n.7 (5th Cir. 1999)).

### A. Traffic Stop

Traffic stops are considered seizures within the meaning of the Fourth Amendment. *Delaware v. Prouse,* 440 U.S. 648, 653 (1979); *United States v. Jones,* 234 F.3d 234, 239 (5th Cir. 2000). However, because a routine traffic stop tends to be "a relatively brief encounter," it is considered "more analogous to a so-called '*Terry* stop' . . . than to a formal arrest." *Knowles v. Iowa,* 525 U.S. 113, 117 (1998) (quoting *Berkemer v. McCarty,* 468 U.S. 420, 439 (1984), in turn citing *Terry v. Ohio,* 392 U.S. 1 (1968)). See also *Arizona v. Johnson,* 555 U.S. 323, 330 (2009). Thus, courts must analyze the legality of traffic stops under the standard articulated in *Terry*, which evaluates: (1) whether the officer's action was "justified at its inception," and (2) whether the officer's subsequent actions were "reasonably related in scope to the circumstances

that justified the stop in the first place." *United States v. Lopez–Moreno,* 420 F.3d 420, 430 (5th Cir. 2005) (quoting *Terry*, 392 U.S. at 19-20). "[T]he investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *United States v. Valadez*, 267 F.3d 395, 398 (5th Cir. 2001) (quoting *Florida v. Royer,* 460 U.S. 491, 500 (1983)). Thus, "once an officer's suspicions have been verified or dispelled, the detention must end unless there is additional articulable, reasonable suspicion. 'At that point, continuation of the detention is no longer supported by the facts that justified its initiation.'" *Id.* (quoting *United States v. Shabazz*, 993 F.2d 431, 436 (5th Cir. 1993)).

Regarding the first prong of the *Terry* analysis, the United States Court of Appeal for the Fifth Circuit has held that "[f]or a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *Lopez-Moreno*, 420 F.2d at 430. *See also Whren v. United States,* 517 U.S. 806, 810 (1996) (permitting a police officer to stop a vehicle if he has probable cause to believe a traffic violation has occurred).

In the instant motion, Defendant highlights that the testimony of Corporal Cowart conflicts with the testimony of the driver of the El Expreso Bus. (Doc. 38 at pp. 4-5). Specifically, Corporal Cowart testified that he "observed the bus cross over the left then the right white-dashed line, basically swerving, drifting." (Tr. 10:8-9). In contrast, when asked if he ever crossed the lanes that evening, the bus driver responded, "No." (Tr. 104:3-5). In opposition, the Government avers that "the facts as established by the full record of testimony during the evidentiary hearing support a reasonable suspicion that a traffic violation had occurred sufficient to justify the traffic stop in this case." (Doc. 39 at p. 6). The Court agrees.

Corporal Cowart and Corporal David both testified that observed the bus fail to maintain its lane of travel. Although there were some differences in exactly what the officers allegedly witnessed, the Court finds the difference to be insignificant. Under both versions, the driver committed a violation. Corporal Cowart testified that he "observed the bus cross over the left then the right white-dashed line, basically swerving, drifting." (Tr. 10:8-9). He later clarified that just the left wheels crossed into the left lane by a "foot, two foot (sic) max" and then "same thing on the right." (Tr. 49: 8-13). Similarly, Corporal David testified that the bus drove "basically, right on top of the line." (Tr. 78:1-3). He then clarified that the bus "crossed within a few inches." (Tr. 78:13-20). In contrast, the driver of the bus maintains that he never crossed the lines. (Tr. 104:3-5). The driver also stated that he knew to drive carefully in the area in which he was ultimately stopped because he, along with other bus drivers, was acutely aware of the police presence. (Tr. 104:19-20). He stated that the police "follow us from the bridge . . . and we know that they stop us." (Tr. 104:21-22). Although the Court believes that the driver had a strong incentive to drive carefully, the Court is equally mindful that violations of this kind may be committed unknowingly. Thus, the Court finds that the evidence presented supports the officers' belief that they had reasonable suspicion to believe that a traffic violation had occurred, sufficient to justify the traffic stop in this case.

Although the Court surmises that the officers' true motivation in effectuating the stop was not in fact the alleged traffic violation, the Court is required to follow Supreme Court and Fifth Circuit precedent which holds that this is irrelevant. It has long been established that the subjective motivations of individual officers in effectuating traffic stops play no part in a court's Fourth Amendment analysis. *See Whren*, 517 U.S. at 811-13; *United States v. Sanchez–Pena*, 336 F.3d 431, 437 (5th Cir. 2003) (holding that "the constitutional reasonableness of the stop

does not depend upon the actual motivations of the officer involved. An officer may stop a motorist for a traffic violation even if, subjectively, the officer's true motive is to investigate unrelated criminal offenses.") (citing *Whren*); *Goodwin v. Johnson*, 132 F.3d 162, 173 (5th Cir. 1997) ("So long as a traffic law infraction that would have objectively justified the stop had taken place, the fact that the police officer may have made the stop for a reason other than the occurrence of the traffic infraction is irrelevant for purposes of the Fourth Amendment. . . .") (citing *Whren*). Thus, where there is an objectively reasonable basis for a stop – such as the improper lane usage alleged here – the existence of pretext is irrelevant. *Id.*

Considering the second prong of the *Terry* analysis, generally, the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop . . . ." *United States v. Brigham,* 382 F.3d 500, 507 (5th Cir. 2004) (en banc). However, it is well-established that while effectuating the stop, a police officer may examine the driver's license and registration as well as run a computer check to ascertain whether the driver has any outstanding warrants or if the vehicle is stolen. *Id.* at 507–08. An officer may also ask the driver about the purpose and itinerary of his trip, including other unrelated questions. *Id.* at 508. Indeed, the officer's questions need not even be related to the purpose of the traffic stop, since "[d]etention, not questioning, is the evil at which *Terry*'s second prong is aimed." *Id.* (quoting *Shabazz,* 993 F.2d at 436). Even still, any unrelated questions or checks must be conducted in such a way that it does not "prolong[] the stop, absent reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez v. United States*, 575 U.S. ___ , ___, 135 S. Ct. 1609, 1615 (2015).

Defendant contends that "the evidence should be suppressed on the basis that the purpose of the [traffic] stop had concluded, once the officer told the bus driver that he was only to give

him a verbal warning." (Doc. 38 at p. 8). Defendant avers that unlike traditional inquiries associated with traffic stops, such as inspecting the driver's license and registration, or inquiring about the driver's destination, a dog sniff is a measure aimed at detective evidence of ordinary criminal wrongdoing, which the Supreme Court has expressly prohibited in other circumstances. (Doc. 38 at p. 9) (citing *Indianapolis v. Edmond*, 531 U.S. 32, 40-41 (2000)). In short, Defendant argues that because the sniff search of the luggage compartment and subsequent full-blown search of Defendant's luggage prolonged the traffic stop, any evidence obtained after the issuance of the traffic warning was obtained unlawfully. (Doc. 38 at p. 9). In opposition, the Government distinguishes the Supreme Court's recent decision in *Rodriguez*, clarifying that it does not rely on a *de minimis* intrusion exception in the instant case, but rather the driver's consent as justification for the stop. (Doc. 39 at pp. 8-9).

Defendants correctly highlight the Supreme Court's reasoning in *Rodriguez*, but the alleged consent by the bus driver in the instant case renders the Court's reasoning in *Rodriguez* inapplicable here. In other words, while it is true that "a dog sniff, unlike the routine measures [of checking a driver's license and registration or asking questions about a traveler's itinerary], is not an ordinary incident of the traffic stop," *Rodriguez v. United States*, 575 U.S. at ___, 135 S. Ct. at 1615; it is equally true that a consensually prolonged encounter does not amount to a detention. *See United States v. Brigham*, 382 F.3d at 508 (noting that "a consensual interrogation may follow the end of a valid traffic stop and that such consensual encounters do not implicate Fourth Amendment concerns") (citing *United States v. Sanchez–Pena,* 336 F.3d 431, 442–43 (5th Cir. 2003)). Thus, the Court finds that *Rodriguez* does not govern; instead, the inquiry here turns on whether the driver's consent was freely and voluntarily given.

9

### B. Consent

A search conducted pursuant to consent serves as one of the few specifically established and well-defined exceptions to the warrant requirement. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973). Importantly, "[c]onsent to search may, but does not necessarily, dissipate the taint of a fourth amendment violation." *United States v. Jenson*, 462 F.3d 399, 406 (5th Cir. 2006) (*United States v. Chavez–Villarreal,* 3 F.3d 124, 127 (5th Cir. 1993)). However, "[t]o be valid, consent to search must be free and voluntary." *United States v. Olivier–Becerril*, 861 F.2d 424, 425 (5th Cir. 1988) (citing *Bumper v. North Carolina*, 391 U.S. 543 (1968); *United States v. Galberth*, 846 F.2d 983 (5th Cir. 1988). To rely upon the consent exception, the prosecution must show by a preponderance of the evidence first, "that the consent was given voluntarily. . . . Second, . . . that either the defendant himself consented to the search or that consent was obtained from a third party that had the ability to furnish valid consent." *United States v. Jenkins*, 46 F.3d 447, 451 (5th Cir. 1995).

With respect to the first prong, the voluntariness of consent is "a question of fact to be determined from the totality of all the circumstances." *Schneckloth,* 412 U.S. at 227. In evaluating the voluntariness of consent, courts have traditionally considered six factors: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. *United States v. Morales,* 171 F.3d 978, 982-983 (5th Cir. 1999); *Olivier–Becerril,* 861 F.2d at 426 (citations omitted). All six factors are relevant, but no single one is dispositive or controlling. *Id.*

With respect to the first two factors, the voluntariness of custodial status and presence of coercive police measures, Defendant contends that these factors weigh in his favor because the bus driver testified that the purpose for stopping the bus was to "check" the bus, not to effectuate a traffic stop. (Doc. 38 at p. 10). Defendant also points to testimony from the driver stating that he was not allowed to refuse the officer's search once the bus was stopped, and the absence of testimony by the officers informing the driver that he was free to leave. (Tr. 105:22). Regarding the presence of coercive police procedures, Defendant concludes that because the true purpose of the stop was to have the bus searched, the coerciveness is "evident." (Doc. 38 at pp. 10-11).

In opposition, the Government avers that "[t]he driver was free to leave once [Corporal] Cowart concluded his questioning and issued a verbal warning." (Doc. 39 at p. 14). The Government concedes that the driver was never informed that he was free to leave, but highlights that the Supreme Court has held that officers are under no obligation to make such an advisement. (*Id.*) (citing *Ohio v. Robinette*, 519 U.S. 33, 39-40 (1996)). The Government also argues that the driver's testimony conceding his feeling that the officers were just doing their job is further indication of the voluntariness of the driver's custodial status. (Tr. 118:20-119:1). The Government then cites the absence of any traditional coercive measures, such as placing the driver in handcuffs or the drawing of weapons. (Doc. 39 at p. 14). Given this, the Government contends that the first two factors weigh in its favor.

The Court agrees, as it must, that the officers were under no obligation to inform the driver that he was free to leave. *See Ohio v. Robinette*, 519 U.S. 33, 39-40 (1996) (holding that it would be "unrealistic to require police officers to always inform detainees that they are free to go before a consent to search may be deemed voluntary"). Moreover, there is conflicting testimony regarding whether the officers discussed any traffic violation with the driver, and whether they

actually phrased their alleged "request" to search the luggage compartment in such a way as to provide even the illusion of a choice. At the evidentiary hearing, Corporal Cowart testified that he informed the driver that he was "drifting out [of his] lane," and then confirmed that the driver was not "too sleepy." (Tr. 13:2-6). He then stated that he would only issue a warning, before inquiring as to the bus's itinerary, and the number of passengers on board. (Tr. 13:7-21). Corporal Cowart then sought consent to "use [his] narcotics-detecting K9 to search the bags underneath the bus – or sniff the bags underneath the bus." (Tr. 15:12-14). The driver then allegedly consented.

The driver's testimony tells a slightly different story. He stated that when police officers requested to search the bus that there was "no option because we have to follow the law . . . we cannot refuse for them to check." (Tr. 105:10-22). He also testified that the police never informed him that he committed a traffic violation on October 16, 2014. (Tr. 106:1-4). Instead, they "only [stated] that they were going to check the bus." (Tr. 106:4). When directly questioned about whether he felt he had a choice, the driver stated, "You cannot refuse because they're doing their job. Because I think that . . . as operators of the bus, if you refuse to be checked, then that could be thought of as we – we have something." (Tr. 117:20-23).

Based on this testimony, the Court finds that the first factor weighs in favor of the Government. Corporal Cowart and Corporal David's testimony established that the traffic stop ended with the issuance of a warning. When asked a few more questions about the driver's itinerary and the number of passengers, the driver continued to respond. When Corporal Cowart sought consent, the driver agreed. The driver further indicated a desire to assist the officers to ensure they did not believe he was involved in any wrongdoing.

12

With respect to the second factor, the Court also believes this weighs in favor of the Government. There is no evidence in the record that the police employed any traditionally coercive procedures, such as placing the driver in handcuffs, drawing their weapons, or threatening him. Further, the Court agrees with the Government's contention that the officers "did not do or say anything that implied that [the bus driver] had to allow him to search the bus." (Doc. 39 at p. 14).

With respect to the third factor, the extent and level of the cooperation with the police, Defendant contends that "[t]here was conflicting testimony as to whether consent was actually sought from Mr. Morales, however, after the fact Mr. Morales was cooperative with police and even aided in translating for [Defendant]." (Doc. 38 at p. 11). Thus, the Government avers that Defendant concedes that this factor weighs in favor of consent. (Doc. 39 at p. 15). The Court agrees. At no point did the driver indicate an unwillingness to cooperate. Indeed, the driver was so cooperative that he even agreed to assist the officers by translating their announcements to the passengers on the bus. Accordingly, the Court finds that this factor weighs in favor of Defendant.

Regarding the driver's awareness of his right to refuse consent, Defendant contends that this factor "weighs heavily against consent," as the driver stated that "he must allow police officials to search the bus and that he has no choice to refuse consent." (Doc. 38 at p. 11) (citing Tr. 105). The Government contends that upon closer examination of the testimony at the hearing, this factor is a "close call." (Doc. 39 at p. 15). The Government directs the Court to alleged inconsistencies in the driver's testimony between his assertion that he had no choice to refuse consent and his acknowledgment that no one told him he had to consent. (*Id.*). Specifically, the Government highlights the driver's admission that "he thinks 'the normal thing'

to do when officers ask for consent to search is to allow them to search because they are simply 'doing their job.'" (*Id.*) (citing Tr. 118:20-21). Further, the Government argues that when pressed, the driver admitted that his belief regarding his ability to refuse consent was not grounded in law, but rather on the failure of his employer to provide written confirmation informing him of his right to refuse. (*Id.*) (citing Tr. 121).

The Court finds the Government's contention unavailing. Although the reason for the driver's awareness of his right to refuse consent may be unclear, his belief that he did not have a right to refuse consent was not. On this point, he consistently maintained that he did not believe he could refuse the officers' alleged request. Moreover, while the Government's assertion that "proof that a suspect had knowledge of his right to refuse is not required for effective consent to search," is correct, it still remains a relevant factor for the court to consider in ascertaining the voluntariness of consent. Thus, the Court finds that this factor weighs against the voluntariness of consent.

The Court must next consider the driver's education and intelligence. Defendant avers that this factor should not weigh in favor of either party, as there was no evidence presented to this point. (Doc. 38 at p. 11). In opposition, the Government agrees that "nothing in the record suggest[ed] that the driver is of less than average intelligence such that he could fully understand the nature of the situation," but argues this means the factor should weigh in favor of the voluntariness of consent. (Doc. 39 at p. 16). The Government further contends that despite the bus driver's native language being Spanish, he explicitly stated that he clearly understood everything the officers said to him. (*Id.*) (citing Tr. 110:8-10). The Court agrees. Defendant is correct that there was no testimony presented regarding the driver's education and intelligence, nevertheless, the driver's actions and responses during the traffic stop do not indicate that he

lacked the education or sufficient intelligence to comprehend what was going on. Furthermore, the Court's impression of the witness at trial supports this finding. Defendant's contention that the Court should not provide weight to this factor suggests that the Court should presume the consenting party lacks education or intelligence. This is not what the law requires. Thus, the Court finds that this factor weighs in favor of the Government.

The final factor – whether the driver believed incriminating evidence would be found – is also indicative of the voluntariness of consent because there is no evidence to suggest that the driver knew Defendant, or that he had any inkling that contraband would be found on the bus.

Weighing the six factors, the Court finds that under the totality of the circumstances, the driver did voluntarily consent to the prolonged seizure and the subsequent canine sniff of the luggage compartment of the bus. Thus, the Government has met its burden.

Having found the driver's consent to be freely and voluntarily made, the final inquiry remaining is whether, under the circumstances presented, the bus driver's consent may be imputed to Defendant, a passenger on the bus. This issue was addressed by the Fifth Circuit in *United States v. Hernandez-Zuniga*, 215 F.3d 483 (5th Cir. 2000). While that case involved an initial stop that was unlawful and this one does not, *Hernandez-Zuniga* remains analogous because both that case and the present one ultimately turn on whether the stop became a consensual encounter.

In *Hernandez-Zuniga*, the defendant was a passenger on a bus stopped by United States Border Patrol agents. *Id.* at 484. The bus company, Valley Transit Company, consented to random stops and required "its drivers to pull over and cooperate" if law enforcement signaled the bus to stop. *Id.* at 485. Once stopped, the Border Patrol agents boarded the bus to conduct an "inspection," and instructed non-citizen passengers to have "immigration documents ready to

15

present." *Id.* at 484.  The defendant was among those questioned; during the questioning, agents obtained consent to search the defendant's bag and discovered cocaine.  *Id.*  The defendant subsequently moved to suppress the narcotics on the ground that the suspicionless stop constituted an unlawful seizure.  *Id.* at 484.  The district court found that the bus company and the driver consented to Border Patrol's stop, and thus, because the seizure was consensual, it did not violate the Fourth Amendment.  *Id.*  Defendant appealed his conviction and sentence, arguing that the district court erred in not granting his motion to suppress.  *Id.* at 484.

Assuming the defendant was seized by Border Patrol agents, the Fifth Circuit turned its focus on whether the seizure was reasonable.  *Id.* at 486-87.  On this point, the court noted that the Supreme Court's definition of reasonableness in the context of seizures that are less intrusive than a traditional arrest "depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers."  *Id.* at 487 (quoting *Brown v. Texas*, 443 U.S. 47, 50 (1979) (citations and internal quotations marks omitted)).  The test requires consideration of "the gravity of the public concerns served by the seizure, the degree to which the seizures advances the public interest, and the severity of the inference with individual liberty."  *Id.* (quoting *Brown*, 443 U.S. at 50).  Of additional importance was the effect of the bus company's consent.  *Id.*  The Fifth Circuit continued by stating that although the concept of third party consent is most often applied in the context of searches, it is equally applicable to seizures.  *Id.* (citing *United States v. Woodrum*, 202 F.3d 1, 11 (1st Cir. 2000)).  Indeed, the same reasons underlying the justification for third party consent searches – the existence of share authority or common control – support its application in the seizure context.

Ultimately, the Fifth Circuit affirmed the district court and found the intrusion on the defendant's Fourth Amendment rights to be "quite limited" because in boarding a commercial

16

bus, the defendant "relinquished . . . a substantial amount of control over his movement." *Id.* at 488. Specifically, the bus company (and the driver) "retained control over what route the bus would take, the speed the bus would travel, and when and where and for how long the bus would stop along the way." *Id.* Relying on the First Circuit's decision in *United States v. Woodrum*, the Fifth Circuit also held that the defendant in *Hernandez-Zuniga* "could neither exclude others nor direct that the bus driver take a particular route. He could not order that the bus continue moving towards its destination despite a driver-determined reason to stop." *Id.* Thus, in boarding the bus, the defendant had "assume[d] the risk that the bus would make unplanned stops, as well as the risk that during these stops the bus might be boarded by Border Patrol agents." *Id.*

The Court finds the Fifth Circuit's reasoning equally applicable here. Like the defendant in *Hernandez-Zuniga*, Defendant did not retain the authority to exclude others from boarding the bus, nor the ability to "order the bus drive to continue moving towards its destination despite a driver-determined reason to stop." *Hernandez-Zuniga*, 215 F.3d at 488. Thus, Defendant assumed the risk in boarding the bus that it could make unexpected stops for any number of reasons, including traffic violations.

For the same reasons, the Court also finds that the bus driver's consent applied to the sniff/search of Defendant's luggage. *See Hernandez-Zuniga*, 215 F.3d at 487 ("In the context of searches, it is well established that the police may conduct a warrantless search of an area without running afoul of the Fourth Amendment if a third party with common control over the area consents to the search."). Here, Defendant, the driver, and El Expreso, had common authority over the luggage compartment of the bus and its contents. Because "[c]onsent by a person who possesses common authority over premises or effects is valid as against a non-

consenting person with whom that authority is shared," Defendant's objection to the search is unavailing. *United States v. Koehler*, 790 F.2d 1256, 1259 (5th Cir. 1986) (citing *United States v. Matlock*, 415 U.S. 164, 171 (1974)). Thus, the bus driver's consent may be imputed to Defendant.

For the foregoing reasons, Defendant's Motion to Suppress is **DENIED**.

Signed in Baton Rouge, Louisiana, on July 10, 2015.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**